**MICHELLE HOLMAN KERIN**, OSB No. 965278
michelle@angelicalfo.com
ANGELI & CALFO LLC
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Anthony Matic*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:24-CR-00291-002-SI |
| Plaintiff, | |
| vs. | **DEFENDANT ANTHONY MATIC'S SENTENCING MEMORANDUM** |
| ANTHONY MATIC, ET AL., | |
| Defendants. | |

**INTRODUCTION**

Anthony "Tony" Matic is a first-time offender who spent 24 years serving the public as a Corrections Deputy, entered his guilty plea at the earliest opportunity, waived his attorney-client privilege and Fifth Amendment rights during the pendency of this criminal case, and has made consistent restitution payments since the day he entered his plea. The government advocates a prison sentence of 24 months. For the reasons set forth below and in the Confidential Supplement to the Presentence Report (Confidential Supp.), Mr. Matic submits that a sentence meaningfully below that recommendation is what the record and 18 U.S.C. §3553(a) requires.

The government's recommended sentence does not fully account for who Mr. Matic is, what his role in this offense actually was, or what he has done since. By all accounts, he was the

PAGE 1 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

operational partner in a real estate venture, in the field, managing properties, not the architect of its financial structure or the mouthpiece and face to investors. Significantly, he contributed the only real capital to the business, built through years of off-duty work as a working law enforcement officer. He followed legal advice, at every stage, that proved catastrophically wrong, advice that $225,622.48 in attorney fees should have got right. A sentence of significantly less than 24 months is sufficient. It is not greater than necessary, it is just.

## DISCUSSION

## I.    HISTORY AND CHARACTERISTICS OF ANTHONY "TONY" MATIC

Mr. Matic is before this Court not as a man who has lived a life of self-interest or disregard for others, but as one who, across more than five decades, has consistently devoted himself to public service, family, community, and the well-being of those around him. The offense conduct in this case represents a painful and anomalous departure from a life otherwise defined by integrity, hard work, and genuine care for others. The Court must consider the totality of who Mr. Matic is not merely the worst chapter of his life. See, e.g., *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (approving of variance based on "the extent to which the criminal conduct was out of character"); *United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) (variance appropriate based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (9th Cir. 2005) (downward departure to a probationary sentence reasonable where defendant was a "law abiding citizen who did an incredibly dumb thing"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353 (S.D.N.Y. 2012) (granting significant downward variance when the defendant's "personal history and characteristics starkly contrast with the nature and circumstances of his crimes").

/ / /

/ / /

PAGE 2 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

**A. Origins and Upbringing**

Mr. Matic was born in Chicago, Illinois, to immigrants from Croatia who carried with them both the hardship and resilience of their homeland. His mother spent years of her childhood in a concentration camp, watching her mom and sister die. His parents, shaped by that trauma, struggled to provide emotional warmth, and Mr. Matic grew up in a household marked by financial austerity and, at times, fear.

And yet, Mr. Matic did not let that environment define him. His father also instilled in him an iron work ethic. From a young age, Mr. Matic was sent out to shovel snow for neighbors, learning early that nothing worthwhile comes without effort. He found his positive outlet in baseball, a sport that shaped his character, his discipline, and his lifelong network of friendship. Relatives in Bosnia and Herzegovina who have known Mr. Matic for decades describe him as a man whose "life is woven with loyalty to his roots and unwavering integrity;" someone who, even after his father's passing, has continued to financially support family members abroad and travels regularly to maintain those bonds. Exhibit 2 to the Confidential Supp., Various Letters of Support, p. 14.

Mr. Matic graduated from Marshall High School in 1987 and went on to attend Mount Hood Community College, where he walked on to the baseball team and earned a scholarship. His coach there, D.S., has known Mr. Matic since 1988 and recalls that Mr. Matic "worked into being an integral part of our team's success" and was selected by his own teammates for two awards: the Golden Glove Award for outstanding defense, and the Mr. Hustle Award for outstanding effort and inspiration, honors voted by peers, not bestowed by coaches. *Id.* at p. 16. Mr. Matic later transferred to Oregon State University where he again walked on to the baseball team before

PAGE 3 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

ultimately graduating from Portland State University in 1993 with a Bachelor's Degree in Psychology. *Id.*

### B. Twenty-Four Years of Public Service

Following his education, Mr. Matic embarked on what would become the defining professional chapter of his life: a 24-year career as a Corrections Deputy with the Multnomah County Sheriff's Office (MCSO). He was hired in the mid-1990s, passed the rigorous background investigation that law enforcement requires, and remained in good standing throughout his career, retiring in 2019 with an exemplary record.

His former colleague J.L., who has known Mr. Matic since 1997 and currently serves as a Juvenile Detention Officer in Washington State, describes the standard Mr. Matic held himself to: "If you looked at [Mr. Matic]'s lengthy history as a deputy, he held an exemplary record of 20 plus years. To be able to earn the privilege of a deputy and keep that position, one had to have impeccable records in driving, credit history and criminality…clean, sterling, spotless." *Id.* at p. 5. She adds simply: "The person, [Mr. Matic], that I worked with was professional and caring; treated the inmates fairly and humanely at all times. He was a role model." *Id.*

S.W., a colleague and close friend who served alongside Mr. Matic at MCSO for more than 30 years and stood as a groomsman at his wedding, echoes this assessment. He writes that "those of us that knew [Mr. Matic] believed in his character of being very trust worthy and possessing good work ethics," and that Mr. Matic is "a very up beat person" whose current depression because of this case has been painful for his friends to witness.

A.G., who met Mr. Matic when Mr. Matic was a law enforcement officer and A.G. had newly arrived in Portland after high school, recalls that Mr. Matic "took me under his wing" during a difficult period of transition, inviting him into his home for Christmas gatherings and serving as

PAGE 4 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

a steady, stabilizing presence. *Id.* at p. 2. A.G. writes that over the "25 years that [Mr. Matic] served in law enforcement, he demonstrated an unwavering commitment to the community. His dedication to public service and his sense of duty were apparent to everyone who knew him. He was not just an officer of the law, but a mentor, a protector, and, to me, a father figure." *Id.* at pp. 2-3.

Mr. Matic's law enforcement background is not a credential he leveraged cynically. It is the authentic foundation of a man who spent nearly a quarter century in service to the public, working corrections, managing difficult populations with fairness and professionalism, and earning the lasting respect of colleagues who knew him day in and day out.

### C.       Community Commitment Beyond Borders

Mr. Matic's dedication to others extended well beyond the walls of the Multnomah County jail. For nearly two decades, Mr. Matic has been an advocate for the Croatian people in Bosnia and Herzegovina, a community to which he belongs by heritage. S.R., a Member of the House of Representatives of the Parliament of the Federation of Bosnia and Herzegovina and President of the Croatian Republican Party, has submitted a formal letter attesting that Mr. Matic has "not only repeatedly spoken out publicly and testified in the United States about the violation of the human rights of the Croatian people in Bosnia and Herzegovina", but has also provided "exceptionally generous material and financial assistance to socially vulnerable families and individuals, children, persons with disabilities, and victims of violence" whose rights the state has failed to protect. *Id.* at p. 11. S.R. writes that Mr. Matic refused multiple public recognitions for this work, a detail that speaks to the authenticity of his motivations. *Id.*

Mr. Matic's extended family in Ljubuški, Bosnia and Herzegovina, who have signed a joint letter to this Court, describe him as a man whose character is defined by "loyalty to his roots and

PAGE 5 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

unwavering integrity." *Id.* at p. 14. One who has continued to support them financially and visit regularly, carrying on the connection his father maintained across oceans even during decades when telecommunications were nearly unavailable in their region.

### D.      Family, Character, and the Man Mr. Matic Is

Mr. Matic has been married for 24 years. Together they have one daughter who is 18 and studying exercise science at college. Friends and colleagues across the arc of Mr. Matic's life describe the same man: present, devoted, and selfless as a husband and father.

His sister-in-law, N.M., a Licensed Practical Nurse who has known Mr. Matic virtually his entire life, writes that Mr. Matic "has always stepped up in times of need when my father could not" and that Mr. Matic is "my first call when I'm truly down." *Id.* at p. 10. His colleague J.L. notes: "To see how respectfully he treats his wife is a beautiful thing. The love he shows for his daughter makes one tearful." *Id.* at p. 5. She adds that Mr. Matic also "allowed his wife's grandmother to live with them giving her a loving and decent home"—and asks rhetorically: "Who does that?…not the usual person. That person would be a caring, kind, and moral person concerned with others well-being." *Id.*

B.W., a close friend of nearly two decades who asked Mr. Matic to stand as a groomsman in his wedding, reflects on what sets Mr. Matic apart: "In all the time I have known [Mr. Matic], I have never once heard him speak maliciously about another person. That may sound like a small thing to some, but in a world where criticism comes cheap, [Mr. Matic] has consistently chosen decency, patience, and empathy." *Id.* at p. 18. B.W. continues: "I can vouch not just for the history of who he has been, but for the character of the man I have watched consistently walk the walk for nearly twenty years. His life's work in law enforcement was never about ego or authority—it was about service and protection. I believe that still defines him." *Id.* at p. 19.

PAGE 6 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

G.W., a franchise operator in Ohio who was Mr. Matic's tenant in one of the buildings owned by Commission PDX and became a lasting friend, offers a ground-level account of Mr. Matic's character as a landlord and businessman. During the pandemic, when G.W.'s restaurants were struggling, Mr. Matic "was an incredibly understanding person regarding it, even going to bat for me with the property management companies to ensure I did not pay more than the rent required." *Id.* at p. 20. When a ceiling collapsed in 2021, Mr. Matic traveled from Portland to Ohio in a single day to personally assess the damage and arrange repairs. G.W. writes that "over the years I rented from [Mr. Matic] he never raised rent, replaced any equipment that went bad in a very timely manner and was always someone you could reach out to and expect a respectful and reasonable response from, that was Mr. Matic as a professional, a standup guy." *Id.*

D.E., a former hitting coach and MLB Scout at a local community college, writes that Mr. Matic's character first revealed itself on the baseball diamond and never changed: "What drew me to him was his work ethic as a baseball player. No one put in more hard work and being good in the game. He took that same work ethic into life. His honesty and outstanding character is what brought us together later on in life." *Id.* at p. 1.

### E.      An Anomalous Chapter in an Otherwise Honorable Life

Mr. Matic's entry into the real estate investment business came after a lifetime of earning trust through service. He retired from the Sheriff's Office in 2019, and, with no prior experience or educational background running a complex investment business, sought to build something for his family. He relied heavily on his business partner, who had more than 20 years of experience in the financial and real estate industries, as well as on the numerous attorneys the defendant retained to oversee the venture's structure and documentation. As the PSR acknowledges and as described in more detail below, Mr. Matic's role in the business was primarily operational: finding,

PAGE 7 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

acquiring, and managing real estate properties. He was regularly out of state while the financial architecture of the business was controlled by his co-defendant.

Mr. Matic has never minimized his responsibility. He acknowledges that there were red flags he should have heeded sooner, that his loyalty to the business led him to remain silent when he should have spoken up, and that his inaction caused real harm to real people, including close personal friends. He is devastated that his conduct caused the extraordinary losses to victims. His former colleague and fellow investor, S.W., writes that he holds "no animosity toward Mr. Matic and what happened." *Id.* at p. 17. The largest individual investor, Mr. Matic's close friend, who suffered a loss of more than $1.3 million and remains deeply hurt by this experience, nonetheless acknowledged that Mr. Matic "has expressed significant guilt over the loss" and that at the outset of the scheme, both defendants "perhaps misplaced their trust in others, primarily the attorneys they hired."

**F.      Acceptance of Responsibility and Tireless Efforts to Make Victims Whole**

Perhaps the most compelling evidence of Mr. Matic's genuine acceptance of responsibility is not what he has said, but what he has done. From the moment it became clear that the government was investigating him, Mr. Matic chose a path that few defendants elect: transparency, cooperation, and a sustained commitment to ensuring that the people who trusted him had every opportunity to recover their losses.

In addition to the information outlined in the Confidential Submission to the PSR, Mr. Matic entered his guilty plea at the earliest practicable opportunity, in March 2025. He has also voluntarily surrendered his Oregon real estate broker's license, foreclosing an avenue of livelihood in acknowledgment of the serious breach of trust this case represents. And since the entry of his guilty plea, Mr. Matic has made regular payments toward restitution. These are small modest

payments to be sure, but each one is a reflection of a man who intends to spend whatever time he has continuing to make things right for the victims.

D.R., a longtime friend, writes that Mr. Matic is a man for whom doing the right thing is not a performance but a practice: he "does what is right even when no one is watching." *Id.* at p. 13. That observation is borne out by Mr. Matic's conduct since the investigation began.

What is most striking about the record before this Court is how consistent the portrait of Mr. Matic is across every relationship in his life; across five decades, across communities in Portland and Ohio and Bosnia and Herzegovina, across coaches and colleagues and tenants and family. The man who plead guilty to two counts of conspiracy and stands before this Court is the same man who flew across the country to repair a tenant's ceiling, who opened his home to his wife's grandmother, who spent 24 years treating incarcerated individuals with fairness and dignity, and who has since the onset of this investigation done everything within his power to ensure his victims are made whole. D.R. captures it plainly: "In a world where true integrity can sometimes be hard to find, [Mr. Matic] stands out as dependable, ethical, loyal, and deeply committed to the people he loves." *Id.* at p. 13.

## II.    MR. MATIC'S OFFENSE CONDUCT

As an initial matter, there is much disputed about the description of the offense conduct in both the government's Indictment and the PSR. The agreed upon conduct outlined in the plea agreement more accurately states the basis for Mr. Matic's plea and the offense conduct. This is not an attempt to minimize the seriousness of his crime; Mr. Matic knows he is guilty of the crimes he plead guilty to. Rather, the descriptions and objections in this Memo and the agreed upon offense conduct in the plea agreement more accurately describes the conduct that underlies his conviction.

PAGE 9 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

First and foremost, this was a real business that became a fraud. That distinction matters for sentencing. At its height, the Commission PDX and its affiliates acquired more than 34 residential properties across three states, generated $348,000 in annual gross rental revenue at peak, and held a real property portfolio ultimately valued at approximately $6 million. PSR ¶28. The harm to investors is heartbreaking, genuine, and significant. But this was a legitimate business and real work was performed to make it profitable, in particular by Mr. Matic. Part of what rendered it criminal was a financing structure that violated the securities laws, a violation that $225,622.48 in legal fees should have identified and corrected at inception but did not. Exhibit 3 to the Confidential Supp., at p. 8.

An expert has provided a detail memorandum to this Court. Exhibit 3 to Confidential Supp. His conclusion: the road to this sentencing was built, stone by stone, by people who should have stopped them and did not. Ex. 3, at p. 9. That conclusion does not minimize what the defendants did. It contextualizes how they got there.

### A.      The Business Was Real and Mr. Matic's Role Was Operational

Mr. Matic's contribution to this venture was tangible from day one. Before he entered business with his co-defendant, he had spent years acquiring four separate multi-family residential properties on his own in Indiana and Ohio. He purchased these properties hustling off duty as a licensed real estate agent while also working full time as a Corrections Deputy. Mr. Matic made the decision to retire from MCSO early to join his co-defendant and start Commission PDX.  Those personally-owned properties were his capital contribution to the joint

venture. To induce Mr. Matic to both join Commission PDX and make this significant

contribution, his co-defendant promised Mr. Matic a salary and $10,000 per month.[1]

Within the business, Mr. Matic's role was operational: finding, acquiring, and managing

the real estate portfolio across Pennsylvania, Indiana, and Ohio. He was regularly out of state

doing that work.[2] He was not the person who managed investor relationships, controlled the

financial accounts, drafted offering documents, or directed the flow of investor funds. That was

his co-defendant. The government acknowledged as much by agreeing to a minor role

adjustment. PSR ¶139.

The reality of the underlying assets is confirmed by what DLP Lending Fund recovered

when it foreclosed. DLP sold 32 properties from the portfolio for $3,765,950. Five more carried

a fair market value of approximately $2,525,960. PSR ¶116. These were not paper transactions.

The money went somewhere real.

### B.    The Financing Structure Was Illegal from Inception and Lawyers Said It Was Not

The promissory note program at the center of this case was built on the content of Matt

Faircloth of the DeRosa Group, a Florida-based real estate educator. Faircloth's 2018 book

applied the wrong Supreme Court test to promissory notes, concluding that private loans fell

---

[1] Notably, the only money Mr. Matic ever received from the business were these agreed upon salary and monthly draws. As described below, he did not go on trips, renovate his home, gamble or otherwise use Commission PDX/investor funds for his personal benefit.

[2] Credit card statements, travel records and other documentation show that Mr. Matic was frequently out of state managing properties and trying to locate new ones during the course of the scheme. In 2019 he was out of state working t implement the business plan 28 days; in 2020, despite the onset of COVID and global travel stoppage, he was out of state for business 34 days; in 2021, he working to obtain new buildings and manage the many existing properties a staggering 64 days; between January and May 2022, when operations ceased, he was out of state conducting business 11 days.

PAGE 11 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

outside the securities laws. Ex. 3, at p. 3. That analysis was wrong. Faircloth compounded the error by co-producing a seminar on the subject with an SEC attorney, lending his analysis an appearance of regulatory approval it did not have. Mr. Christensen confirmed in deposition that the framework was "huge—pivotal" to his understanding of the business. And crucially, it was confirmed by his lawyers.

### 1.    First Counsel: I.C.

I.C. was a divorce and family law attorney and a personal friend of Mr. Christensen's wife. She was not a securities attorney and lacked the professional liability coverage Oregon attorneys carry for securities work. Ex. 3, at pp. 5–6. On May 23, 2018, she revised and approved the form of promissory note used to engage investors throughout the life of the program. *Id.* The note required funds to be used for "business purposes, "language she inserted without defining it in any disclosure document, without identifying the applicable legal standard under Reves, and without advising the defendants that the offering was an unlawful unregistered securities issuance. Her advice on the Faircloth framework, as confirmed in deposition, was: "Yes, it's got to be nine months or less." Ex. 3, at p. 6.

The note I.C. approved was the instrument used to engage the vast majority of investors in this case and the basis for some of the allegations in the government's indictment. By the time any qualified securities attorney reviewed the program, those notes had been issued, those investors had committed their funds, and the obligations that would prove impossible to meet had already been made.

### 2.    Second Counsel: A Prominent Portland Law Firm

The defendants later retained a prominent Portland law firm with a dedicated securities practice.

PAGE 12 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

Defendants worked initially with a prominent attorney, B.K., who reviewed and revised promissory notes and worked closely with defendants to understand the nature of the business. That lawyer never advised defendants that the notes were potentially securities, that they needed to provide disclosures or to only deal with accredited investors.

A securities attorney at the firm, R.L., identified in substance that the demand notes might constitute securities. This was the first time any lawyer had said so. Ex. 3, at p. 6. That disclosure came long after I.C. and B.K. had approved the note form and long after most investors were already committed. And it did not produce the advice the moment required.

Notably, R.L. did not advise the principals to cease operations. He did not advise rescission. He did not advise that registration was legally required and impossible without audited financial statements. Instead, the firm prepared a Private Placement Memorandum for the proposed CPX20-Fund I, a vehicle the defendants were told would bring the program into compliance. The defendants followed that advice. They built the fund and circulated the PPM. They used it to roll over existing investor obligations, exactly as counsel directed. The fund was "stillborn from the moment it was conceived:" lawful qualification was impossible without auditable records, and there were none. Ex. 3, at 4. The fund deepened investor harm rather than remedying it. But the defendants did not know that. They did what their lawyers told them to do. Notably, the fund and PPM features heavily in both the PSR and the government's Indictment.

### C. DLP Foreclosed the Real Asset Base

As the business deteriorated, the defendants secured a $4,392,428 commercial loan from DLP Lending Fund. PSR ¶115. DLP took a first-position lien across the entire property portfolio, at a time when the portfolio's equity exceeded the loan principal. When Innings 150, LLC, a related entity holding the note, missed payments and filed for bankruptcy, DLP foreclosed across

PAGE 13 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

the portfolio. PSR ¶119; *In re Innings 150, LLC*, Case No. 23-32634-pcm-7. DLP has since sold 32 properties for $3,765,950, with five remaining at an estimated $2,525,960. PSR ¶116. DLP's full recovery from collateral liquidation has been applied against its loss, leaving no commercial lender restitution. PSR ¶122.

The consequence for individual investors was severe: DLP's first lien swept the entire property base, leaving note holders with no recourse to the underlying real estate. The magnitude of individual investor losses in this case is in substantial part a function of that lien priority.

Mr. Matic has gone further still. Since entering his guilty plea in March 2025, he has made consistent restitution payments to the Clerk of Court. These payments are small but given his limited financial situation and inability to obtain a job because of the publicity around this case, they are a sign of his dedication to making victims whole. He has also surrendered his Oregon real estate broker's license. He intends to work toward full restitution for as long as it takes. These are not mere gestures but the actions of a man who understands that his failure to act caused real harm, and who has accepted that the remainder of his productive life is owed, in part, to the people he failed.

### E. The SEC's Assessment: Incompetence, Not Sophistication

The lead investigator of the SEC Enforcement Division told defendants' lawyer directly that these defendants had operated the worst business model he had ever seen in his decades at the Commission. Ex. 3, at pp. 3–4. Following the depositions in which Messrs. Matic and Christensen cooperated fully and incriminated themselves, the SEC staff made no contemporaneous criminal referral recommendation. Ex. 3, at p. 6.

One victim described the defendants as having flown "like Icarus, leaving the victim and other investors to burn as they fell." PSR ¶128. Defendants' expert. responds directly: "Icarus's

PAGE 14 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

wings were made of wax by someone who knew they could not survive the sun. The promissory note program was built by Matt Faircloth and validated by two law firms. The principals flew in it because they were told it would hold." Ex. 3, at p. 8.

## III.    OBJECTIONS TO THE PSR

Defense counsel submitted detailed written objections to the Presentence Report (PSR) on April 11, 2026. While the probation office acknowledged some of those objections by adding "defense counsel notes" to certain paragraphs with the information provided, that approach is itself the subject of this section. As explained below, the PSR's offense conduct narrative, and its treatment of the victim interview summaries in particular, does not accurately state Mr. Matic's individual role in this offense. The probation office's decision to relegate defense-supported corrections to parenthetical notations, rather than revising the narrative to reflect what the government's own investigative records show, has resulted in a PSR that, read as a whole, presents a misleading picture of this defendant's culpability to this Court. These changes do not affect the guideline calculations but are vital to accurately describe the offense conduct to this Court.

### A.    The Offense Conduct Narrative Improperly Conflates Mr. Matic's Role with That of His Co-Defendant

Paragraphs 23 through 121 of the PSR purport to describe the offense conduct. Read as a whole, that narrative portrays two defendants acting in equivalent or near-equivalent roles throughout the conspiracy. That framing is contradicted by the sworn record, by the victim interviews the PSR itself relies upon, and by the government's own assessment of Mr. Matic's culpability.

It is undisputed by both the government and Mr. Christensen's sworn SEC testimony that Mr. Christensen controlled the financial architecture of the scheme. He managed investor

PAGE 15 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

relations, made all decisions regarding the promissory notes (with the advice of lawyers), directed the flow of investor funds, created the fraudulent documents used to solicit and retain investors, coached investors in one-on-one conversations about obtaining HELOC loans and liquidating retirement accounts, and controlled the Foresee Inc. accounts through which investor money was received and disbursed. He built and maintained a database of approximately 7,000 former mortgage clients to systematically expand the investor pool throughout the life of the conspiracy.

Mr. Matic's role was different in kind and in degree. He was responsible for finding, acquiring, and managing the real estate properties that formed the stated purpose of the business. His work was field-based and travel-intensive. He was regularly away from Oregon working on properties. He was not the person investors called with questions about their money. With few exceptions, he was not the person who decided when or whether investors would be repaid. As the overwhelming majority of investors confirmed in their own words to government investigators, their financial dealings were with Mr. Christensen and not Mr. Matic.

The government acknowledged this reality through its agreement to a minor role reduction under USSG §3B1.2(b), concluding that Mr. Matic was "substantially less culpable" than his co-defendant. PSR ¶139. The PSR's narrative does not reflect that conclusion. Throughout paragraphs 23–121, actions and statements are attributed jointly and equally to "Christensen and Matic," a drafting convention that obscures the very distinction the government itself has conceded.

**B.    The PSR's Treatment of the Victim Interview Summaries Should Be Corrected.**

The PSR states at Paragraph 38 that the victim interview summaries are intended to "**detail the victim's personal experiences with Christensen and Matic as it relates to the**

PAGE 16 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

**offense conduct**." That framing implies that the narrative would fairly differentiate the victims'' interactions with each defendant. However, the summaries portray both defendants as having played a comparable role in each investor relationship. They do not. The actual interview records these summaries are based on, the government's own 302s and memoranda of interview (MOIs), tell a consistent and markedly different story: in interaction after interaction, investors confirmed that their financial dealings were with Mr. Christensen, and that Mr. Matic's involvement, if it existed at all, was limited to the operational side of the real estate business.

When defense counsel submitted written objections identifying these discrepancies, with specific citations to the underlying 302s and MOIs, the probation office did not meaningfully revise the offense conduct narrative. Instead, it added parenthetical notations throughout the report attributing the corrections to "defense counsel." See PSR ¶¶46a, 51a, 62a, 75a, 87a, 94a, 101a, 104a, 113a. This approach is procedurally inadequate and substantively unfair. The information contained in those parenthetical notations is not a defense argument. Instead, it is drawn directly from the government's own investigative records. By labeling it as "defense counsel notes" rather than incorporating it into the narrative, the PSR signals to the Court that these facts are contested or one-sided, when in reality they are affirmatively supported by the government's own case file.

### 1.    Victims M.M. and S.M. (PSR ¶¶88–94, 94a)

The PSR's main narrative describes M.M. and S.M.'s investment experience in terms suggesting involvement by both defendants. The government's own MOI, however, contains an unambiguous statement: M.M. and S.M. told investigators that they never had any interactions with Anthony Matic. MOI ¶13. This is not a nuanced or qualified characterization; it is a categorical statement from the victims themselves. It does not appear in the main narrative. It

PAGE 17 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

appears only in a parenthetical at Paragraph 94a, labeled as coming from "defense counsel." It did not come from defense counsel. It came from the victims.

### 2. Victims R.B. and S.B. (PSR ¶¶76–87, 87a)

R.B. and S.B. told law enforcement that Mr. Matic was never physically present for any meeting with them, that he called in by phone and "was always out of town," and that "Christensen was the brains for the investment and Matic was the 'boots on the ground.' Matic was the partner who went in the field to look at and evaluate properties." 302, at p. 2. They further confirmed that it was Mr. Christensen, not Mr. Matic, who communicated with them about their investments and who recommended they obtain a HELOC loan. *Id.* at p. 3. These are the victims' own words, documented in the government's investigative file. They appear in the PSR only as a parenthetical at Paragraph 87a, attributed to "defense counsel."

### 3. Victim I.Z. (PSR ¶¶105–113, 113a)

I.Z. is Mr. Matic's closest friend and the single largest individual investor in this case. Despite that relationship, the government's 302 documents that I.Z. told investigators he "exclusively dealt with Mr. Christensen when it came to the finance part of the investment and mostly talked to Matic about the condition of the properties." 302 at p. 4. I.Z. further confirmed that it was Mr. Christensen who convinced him to refinance his home to fund additional investment, not Mr. Matic. The PSR's main narrative of paragraphs 105–113 routinely attributes actions and statements jointly to "Christensen and Matic" without differentiation, even where the underlying 302 attributes specific conduct to Mr. Christensen alone. The correction appears only at Paragraph 113a, labeled as coming from "defense counsel."

/ / /

/ / /

PAGE 18 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

4.      **Victim N.B. (PSR ¶¶63–75, 75a)**

N.B. was a personal friend of Mr. Matic who was introduced to the business venture by Mr. Matic. The PSR's main narrative attributes virtually every statement and interaction in N.B.'s account jointly to "Christensen and Matic" without differentiation. That undifferentiated joint attribution is inconsistent with the accounts of every other investor interviewed in this case, all of whom drew a clear line between Mr. Christensen's investor-facing role and Mr. Matic's operational one. It is also inconsistent with Mr. Christensen's own sworn SEC deposition testimony, in which he confirmed that he was the person who made all decisions about the promissory notes, answered all investor questions about terms and money, and that Mr. Matic's communications were limited to property-related matters. The correction appears only in a parenthetical at Paragraph 75a.

5.      **Victim D.P. (PSR ¶¶52–62, 62a)**

D.P. told investigators that while she had met Mr. Matic, she had no substantial interaction with him and specifically stated that on occasions when Mr. Matic was present, it was Mr. Christensen who did most of the talking. 302, at p. 7. Every investment decision D.P. made, including rolling over her initial investment and later investing the proceeds from the sale of her home, arose from conversations with Mr. Christensen. The main narrative does not reflect this. The correction is relegated to a parenthetical at Paragraph 62a.

6.      **Victim M.B. (PSR ¶¶39–46, 46a)**

The government's investigative records establish that M.B. had no meaningful interaction with Mr. Matic and had no substantial understanding of Mr. Matic's role in the company. The 302 underlying M.B.'s account describes his experience entirely in terms of his dealings with

Mr. Christensen. This fact does not appear in the PSR's main narrative. It appears only in a parenthetical at Paragraph 46a, as "defense counsel indicated."

### 7.    Victims M.L. and D.O. (PSR ¶¶95–101a, 102–104a)

M.L. told investigators that Mr. Matic was rarely at the office and that M.L. did not meet with Mr. Matic during the course of his investment. MOI at p. 2. D.O. told investigators that he "didn't talk to Matic about his real estate investments" and believed Mr. Matic was involved with a different part of the business altogether. MOI ¶11. Both statements are supported by the government's own investigative records. Neither appears in the PSR's main narrative. Both are relegated to parentheticals at Paragraphs 101a and 104a, both as "defense counsel noted."

### C.    The "Defense Counsel Notes" Format Creates a Misleading Asymmetry

The PSR's main narrative presents a version of events consistent with joint and equal participation by both defendants. In each instance, the government's own investigative records contradict that framing. In each instance, the probation office declined to revise the main narrative and instead created a two-tier document: a primary narrative attributing conduct jointly to both defendants, followed by parenthetical "defense counsel notes" containing what the record actually shows.

This structure signals to the Court that the facts in the parentheticals are disputed or one-sided, when in reality, those facts are drawn from the government's own case file. A court reading this PSR without access to the underlying 302s and MOIs would reasonably understand the "defense counsel notes" to represent advocacy, not government-documented victim statements that independently support the defense's position. That distinction matters significantly for the Court's individualized role-based analysis under Section 3553(a).

PAGE 20 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

The PSR's offense conduct narrative should reflect it as well. Defense counsel respectfully urges this Court to look beyond the main narrative of paragraphs 23–121 and to consider the full record, including the facts documented in the parenthetical notations, which originate with the government's own investigators, when assessing Mr. Matic's individual role and culpability.

**D.      Specific Objection to PSR Paragraph 25: Access to Financial Accounts**

Paragraph 25 of the PSR states that Mr. Matic "had access to all bank accounts." This assertion is factually incorrect and was specifically omitted from Paragraph 5 of the Plea Agreement for that reason. Mr. Matic did not have access to Foresee Inc.'s financial accounts or documents. Foresee Inc. was Mr. Christensen's pre-existing financial investment firm, it predated the business venture with Mr. Matic, and it served as one of the primary vehicles through which promissory notes were issued to individual investors and through which investor funds were received and disbursed. Mr. Christensen confirmed in his SEC deposition that he controlled the flow of investor funds, including the use of new investor money to repay earlier investors. The probation office acknowledged the defense objection but did not correct the paragraph. The notation at Paragraph 25 that "Defense counsel noted that Matic did not have access to financial accounts and documents related to Forsee Inc." does not cure the error in the main text, which continues to overstate Mr. Matic's financial access and, by extension, his culpability in the financial dimensions of the scheme. The PSR should be corrected.

**E.      Specific Objection to PSR Paragraph 31: Personal Expenditures and Mr. Matic's Capital Contribution.**

Paragraph 31 states that the defendants "used the victim's money for various personal expenses such as gambling, massages, cryotherapy, trips, and renovating Christensen's personal

PAGE 21 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

home." The paragraph attributes these expenditures jointly to both defendants. This attribution is inaccurate as applied to Mr. Matic, and its inaccuracy goes uncorrected in the PSR's main text.

The personal expenditures identified in Paragraph 31 were made by or for Mr. Christensen, not Mr. Matic. Mr. Christensen used investor funds for gambling, for personal travel and vacations, including a trip to Hawaii, and for the renovation of his personal residence. Witness accounts refute any suggestion that Mr. Matic participated in or benefited from these expenditures. Mr. Matic did not accompany Mr. Christensen and on fishing or hunting trips, or any other personal travel funded by investor money. He did not go to Hawaii using investor funds. He did not gamble with investor funds. He did not renovate a personal residence with investor funds. The joint attribution in Paragraph 31 conflates the conduct of two men whose personal use of business resources was neither equivalent nor comparable.

What Mr. Matic received from the business were agreed-upon salary draws structured at the outset of the business relationship. These draws were not an after-the-fact extraction of investor funds; they were compensation terms negotiated between the two partners when the business was formed, in part to induce Mr. Matic to retire early from his 24-year career with the Multnomah County Sheriff's Office to devote himself full-time to the venture. They were compensation for the substantial and documented operational work Mr. Matic performed: traveling to Pennsylvania, Indiana, and Ohio; identifying, acquiring, and managing dozens of multi-family residential properties; and serving as the hands-on operational partner of a real estate business that, at its peak, held interests in 34 properties across three states.

The PSR does not reflect a fact that is critical to a complete and accurate understanding of Mr. Matic's position in this business: he was the only partner who made a capital contribution to the venture. Before this business relationship began, Mr. Matic had spent years building a

PAGE 22 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

personal real estate portfolio on the side, acquiring multi-family residential properties through his own effort and resources while working full-time as a Corrections Deputy at the Multnomah County Sheriff's Office. Those properties, earned through years of personal investment and labor during off-duty hours, were contributed by Mr. Matic as his capital contribution to the joint business entity when the venture with Mr. Christensen was formed.

This fact is significant for two independent reasons. First, it confirms that Mr. Matic's participation in the venture was genuine, asset-backed, and undertaken in good faith. He did not enter this business as a passive beneficiary or a knowing instrument of fraud; he entered it as an investor who put his own real property on the line. Second, as a direct consequence of this case, Mr. Matic has lost that investment entirely. The properties he contributed have been consumed through the bankruptcy and collateral liquidation process. He stands before this Court having already suffered a substantial personal financial loss of his own, over and above any restitution obligation. The PSR's failure to reflect this fact presents an incomplete and skewed picture of Mr. Matic's financial relationship to this offense.

The parenthetical at Paragraph 31 acknowledges only that "Defense counsel asserts that the personal expenditures indicated above were not made by Matic." That notation is insufficient. It frames a factual correction as a defense assertion. The main text of Paragraph 31 should be revised to accurately distinguish between the two defendants' personal use of business funds.

In sum, the PSR as written does not accurately represent Mr. Matic's individual role in this offense. The offense conduct narrative conflates two defendants whose roles were materially different. Defense counsel respectfully requests that this Court read the PSR with these objections in mind for an accurate account of Mr. Matic's role in the offense conduct and that it

PAGE 23 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

consider a downward variance from the advisory guideline range consistent with the factors set forth under 18 U.S.C. §3553(a).

## IV.    THE SENTENCING GUIDELINES.

The fundamental tenet of federal sentencing is clear: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. §3553(a)(2)]." 18 U.S.C. § 3553(a). In applying this principle, courts are instructed to take a comprehensive view of the individual and the offense, weighing a variety of factors to arrive at a just sentence. The Sentencing Guidelines serve as one such factor, but no more than that. As the Ninth Circuit has explained, the Guidelines are only "one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence," and they are not to be given "more or less weight than any other." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

A thorough application of the § 3553(a) factors confirms a substantial variance from the government's recommendation of 24 months is warranted. Mr. Matic is a first-time offender. He has pled guilty, cooperated with investigators and victims, waived attorney-client privilege, surrendered his real estate license, and has been making ongoing restitution payments since the entry of his plea. He carries the weight of what he failed to do, and the harm it caused to people he cared about, every day. The Court is respectfully asked to weigh the full measure of this man's life as it considers a sentence sufficient, but not greater than necessary, to serve the purposes of justice.

/ / /

/ / /

/ / /

/ / /

PAGE 24 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

### A.    Agreed Upon Guidelines Calculation

The parties agree the following Guidelines are applicable:

| | |
|---|---|
| Base Offense Level (USSG §2B1.1 (a)(1)) | 7 |
| Loss more than $3,500,000 but less than $9,500,000 (USSG §2B1.1(b)(1)(J)) | 18 |
| Victim Enhancement §2B1.1(b)(2)(B) | 4 |
| Gross receipts > $1M from financial institution (§2B1.1(b)(17)(A)) | 2 |
| Minor Role (U.S.S.G. § 3B1.2(b)) | -2 |
| Adjusted Offense Level | 29 |
| Acceptance of Responsibility (USSG § 3E1.1) | -3 |
| Government Agreed Variance 18 U.S.C. §3553(a) (-4 victims; -2 early resolution) | -6 |
| **Total Offense Level** | **20** |

A total offense level of 20 yields an advisory sentencing range of 33-41 months. The government is recommending 24 months imprisonment. The Court should impose further variances and impose a sentence of less than 24 months.

### B.    The Sophisticated Means Enhancement Does Not Apply

The PSR wrongly advocates for a two-level enhancement for sophisticated means under USSG §2B1.1(b)(10)(C). PSR ¶136. The parties did not agree to the sophisticated means enhancement and the government does not seek it.  The enhancement does not apply to the conduct of either defendant, but it is particularly inapplicable to Mr. Matic.

The PSR identifies several bases for the enhancement: the use of multiple business entities, the creation of fraudulent investor account summaries, the preparation of false IRS forms, the 130-page CPX20-Fund I investment pamphlet, and the systematic coaching of investors to obtain HELOC loans and liquidate retirement accounts.

PAGE 25 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

The business entities identified as evidence of sophisticated means were structured by licensed attorneys retained throughout the life of the venture and represent standard business practices.[3] As the PSR itself acknowledges at Paragraph 120, Christensen and Matic paid more than $225,000 in attorney fees, and "the involvement of legal counsel contributed to Christensen and Matic's belief that the conduct * * * was lawful."

As established by the victim interviews, Mr. Christensen's own sworn SEC testimony, and the government's own assessment of the defendants' respective roles, Mr. Matic did not create these documents, did not manage the investor relationships through which the scheme was sustained, and did not advise investors in any way about HELOC loans or retirement account liquidations. Those conversations happened between Mr. Christensen and investors, frequently in meetings Mr. Matic did not attend and on phone calls Mr. Matic was not party to.

The sophisticated means enhancement is intended to capture defendants who bring a level of deliberate complexity and concealment to their offense conduct that goes beyond what is inherent in the offense itself. USSG §2B1.1(b)(10)(C). Mr. Matic was an operational partner, in the field, evaluating and managing properties, while Mr. Christensen designed and executed the

---

[3]Separate entities for holding and managing real estate is not a red flag or unusually sophisticated. It is standard practice across the country. Every commercial landlord, every REIT, every real estate private equity fund in the country uses this structure. The PSR identifies the use of multiple LLCs, one to hold title, one to issue promissory notes, one to manage operations, as evidence of sophisticated means. PSR ¶136. But this venture held 34 single and multi-family homes in Pennsylvania, Indiana, and Ohio. PSR ¶28. Of course it used multiple entities. A business that owns three dozen properties across three states and also raises investor capital needs distinct legal structures for liability segregation, title holding, and financing. That is not sophistication in the service of fraud. That is ordinary real estate practice, structured by attorneys. PSR ¶120. If the use of a holding LLC and an operating LLC is sophisticated means, then sophisticated means describes likely most of the real estate businesses in America. That cannot be the standard.

PAGE 26 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

investor-facing dimensions of the scheme that form the actual basis for this enhancement. Applying the enhancement equally to Mr. Matic on the basis of general awareness and the conduct of his co-defendant is inconsistent with the individualized assessment the guidelines require.

### C.      The Guidelines Overstate the Seriousness of Mr. Matic's Conduct.

As the Court well knows, it has broad discretion to impose a downward variance "based solely on policy considerations," including a court's disagreement with the rationale or structure of a particular guideline. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). That discretion applies "even where that disagreement applies to a wide class of offenders or offenses." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc).

This principle carries particular weight when the relevant guideline, as here, lacks grounding in empirical data or national sentencing experience. See *Kimbrough*, 552 U.S. at 109–10. Section 2B1.1, the fraud guideline, is a prime example of the lack of empirical support. Rather than emerging from data or sentencing experience, the fraud guideline has evolved primarily through politically driven directives that ratchet up sentences without meaningful calibration to culpability. See *United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J. concurring) (noting that recent increases to the fraud guideline were adopted "without the benefit of empirical study," rendering the guideline "fundamentally flawed"). Courts have described the resulting sentencing ranges as "irrational on their face," particularly where loss is the sole—or overwhelming—driver of the offense level. See *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) (criticizing sentences tied to the guidelines' reliance on a "single factor—loss or gain" as "irrational on their face," and imposing a 24-month sentence where the guideline range was 78–97 months); see also *United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 8

PAGE 27 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

27, 2018) (describing "the feeble underpinnings of the loss enhancement"); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (noting that the fraud guidelines have "frequently been criticized"); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008) (loss-driven sentencing paradigm "does not provide realistic guidance").

Another widely recognized problem with § 2B1.1 is its reliance on overlapping enhancements that overstate culpability in high-loss fraud cases. In Mr. Matic's case, three enhancements, 18 levels for loss above $3,500,00 million, four levels for 4 or more victims, and two levels for obtaining more than $1 million from financial institutions,[4] together add more than four years to the Guidelines range. Yet these factors are all associated with losses, effectively punishing the same conduct multiple times. See, Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent. R. 167, 171 (2008) (observing that the Guidelines "punish[] the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting"); see also Samuel W. Buell, Overlapping Jurisdictions, Overlapping Crimes, 28 Cardozo L. Rev. 1611, 1648–49 (2007) (describing enhancements for multiple

---

[4] The Court should recognize that the comments of the Sentencing Guidelines define "financial institution" far more broadly than Congress did in 18 U.S.C. § 20 and similar statutes. See, U.S.S.G. § 2B1.1, cmt. n.1. That gap matters here. Several lenders in this case and captured by the Guidelines' definition were not federally insured or regulated institutions. Instead, they were hard money and predatory lenders whose aggressive collateral enforcement and equity-stripping practices diverted value away from the investor victims and do not meet the definition of financial institutions as defined by Congress. The Guidelines' comments defining financial institution make no distinction between a defrauded federally chartered bank and a predatory, non-regulated lender.

Significantly, on April 20, 2026, the Supreme Court granted certiorari to determine whether Courts must apply the commentary of the Guidelines to a defendant unless it is "plainly erroneous or inconsistent with" it, thus potentially undermining whether if in a year from now, such an enhancement would be applicable at all in a similar case. *See, Beaird v. United States* (U.S. Supreme Court Case No. 25-5343).

.

PAGE 28 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

victims and abuse of trust as classic double-counting). Numerous courts have criticized this dynamic and reduced sentences accordingly. See, e.g., *Adelson*, 441 F. Supp. 2d at 510 ("piling-on of points" has rendered fraud guidelines "patently absurd on their face"), aff'd, 301 F.App'x 93 (2d Cir. 2008); *Parris*, 573 F. Supp. 2d at 745 (quoting *Adelson*). The Court should do the same here.

## V.     A Significant Variance is Appropriate to Fulfill the Sentencing Goals of Deterrence.

### A.     Specific Deterrence

There can be no serious question that Mr. Matic is not likely to reoffend. Mr. Matic, 56, has no significant prior criminal history, has expressed deep and authentic remorse, and has acted in a way to ensure victims are fully repaid. [5] He will never come before this Court again. Specific deterrence has been achieved and his risk of recidivism is effectively zero. *See Pepper v. United States*, 562 U.S. 476, 488 (2011) (courts must consider risk of reoffending); *United States v. Campbell*, 762 F. App'x 877, 879 (11th Cir. 2019) (noting that the District Court's "44-month downward variance reflected the court's consideration of [the defendant's] characteristics, including his age, low risk of recidivism, and family relationship and of the seriousness of his criminal history[]").

/ / /

/ / /

---

[5] It is both reasonable and appropriate for the Court to consider Mr. Matic's history and age (56) when determining his likelihood of recidivism. Defendants over the age of 40 at the time of sentencing exhibit substantially lower rates of recidivism in comparison to younger defendants. See U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of The Federal Sentencing Guidelines, at 28 (2004); see also U.S. Sentencing Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, at 10 (2017). Based on Mr. Matic's history of respecting the law, his age, lack of criminal history, and the strong support of his friends and family, his likelihood of recidivism is as close to zero as an individual can be.

B.      **General Deterrence**

General deterrence is satisfied with a sentence of significantly less than 24 months. A harsher sentence, given Mr. Matic's mitigating conduct, would undermine deterrence and disincentivize others who have engaged in criminal conduct from taking the very significant steps Mr. Matic has taken.

Ninth Circuit precedent aligns squarely with these principles. The Ninth Circuit has repeatedly recognized that extraordinary post-offense conduct—including voluntary disclosure and restitution—may justify substantial variances under 18 U.S.C. § 3553(a). See *United States v. Autery*, 555 F.3d 864, 874–75 (9th Cir. 2009) (affirming probationary variance based on individualized assessment and post-offense conduct); *United States v. Ruff*, 535 F.3d 999, 1004–05 (9th Cir. 2008) (recognizing that acceptance of responsibility beyond the Guidelines may warrant a variance); *United States v. Miller*, 991 F.2d 552, 553–54 (9th Cir. 1993) (extraordinary restitution supports downward departure or variance); *United States v. Green*, 152 F.3d 1202, 1207–08 (9th Cir. 1998) (post-offense conduct, including restitution, is relevant to sentencing).

VI.     **The Requested Sentence Protects the Public and Satisfies Respect for the Law.**

The Court must also consider whether the sentence imposed "reflect[s] the seriousness of the offense, . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The requested sentence satisfies those goals.

A.      **The Requested Sentence Given Mr. Matic's Background Promotes Respect for the Law.**

For a first-time offender like Mr. Matic, pleading guilty to a felony offense represents a severe consequence. As courts have recognized, probation or short terms of incarceration carry enormous weight for individuals with no criminal history. See *Watt v. City of New York, 707 F. Supp. 2d 158 (E.D.N.Y. 2010)* ("Two years in a federal prison is a long time for someone who

PAGE 30 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

has never been to prison before.").

But prison is only one part of the punishment Mr. Matic will bear for the rest of his life. The indictment and conviction have destroyed his professional reputation, ended his career, depleted his finances, ruined deep and longstanding friendships, and triggered widespread scrutiny across the media. These consequences will be lasting and deeply damaging; indeed, by all accounts Mr. Matic has remorse and shame because of his conduct. *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where the defendant's business was destroyed); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance warranted based on reputational harm and media exposure). The requested sentence promotes respect for the law.

**B.      The Requested Sentence Protects the Public Because Mr. Matic is Not a Danger to the Community**

A sentence of significantly less than 24 months also protects the public. There is no indication that Mr. Matic represents an ongoing risk to the community. Mr. Matic is a first time offender and in addition to his actions of paying restitution, pleading guilty quickly, and the other actions outlined in the Confidential Supplement to the PSR, he has a loving family and friends, and he has dedicated himself to being a role model and being present for them. He has been on pretrial release for two and a half years and has fully complied with his conditions. Mr. Matic wants to serve whatever sentence this Court imposes, be with his family and be a productive member of society, helping others and supporting his family. A prison sentence will not protect the public in any meaningful way.

/ / /

/ / /

PAGE 31 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

**C.    A Sentence of Significantly Less Than 24-Months is Warranted Because Mr. Matic May Face Substantially Harsher Conditions of Confinement Because He is a Former Law Enforcement Officer.**

The Court should consider that Mr. Matic's background as a former corrections officer may materially and unavoidably alter the nature of any prison sentence he receives, making even a short term of imprisonment substantially more punishing than the same sentence served by a similarly situated defendant without that background. The risk is not speculative. Former law enforcement and corrections officers incarcerated in the federal system are well-documented targets of inmate violence. Cameron Lindsay, a former federal warden who supervised five BOP facilities over twelve years, has stated that placing a former officer in general population "is an invitation for disaster;" that in higher-security environments "there are inmates that will be waiting at the door . . . that will want to investigate and will assuredly find out the background to some degree on every inmate that comes in that door." *See* Scripps News, *Protecting Ex-Officers From Becoming Targets While Serving Prison Time*, https://scrippsnews.com/stories/protection-for-ex-officers-in-prison.

Beyond the direct threat of violence, BOP policy itself may subject Mr. Matic to a more restrictive and onerous institutional experience than other inmates with identical point scores. PSR ¶198.[6] This may result in his ineligibility for a camp or lower-level facility.

---

[6] Under BOP Program Statement 5180.05, Central Inmate Monitoring System (Dec. 31, 2007), and its implementing regulation at 28 C.F.R. §§ 524.70–.76, inmates with a law enforcement background are designated as Central Inmate Monitoring (CIM) cases — a classification that triggers heightened scrutiny of all transfers, temporary releases, and community activities, and requires Central Office or Regional Office clearance for movements that other inmates obtain routinely. 28 C.F.R. § 524.74; Bureau of Prisons, Program Statement 5180.05 § 9, p. 4 https://www.bop.gov/policy/progstat/5180_005.pdf (last visited April 20, 2026).

Additionally, under BOP Program Statement 5100.08, Inmate Security Designation and Custody Classification (Sept. 12, 2006, as amended by CN-2, Mar. 6, 2025), the BOP may apply Management Variables that override Mr. Matic's security point score entirely, potentially

PAGE 32 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

Courts have observed that where a defendant is subject to "more onerous conditions of confinement than the typical defendant, the court can impose a shorter prison sentence and obtain the same punitive effect. A departure is warranted because at least one of the purposes of sentencing -- just punishment -- is satisfied by a shorter sentence." *United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wisc. 2003); see also, *United States v. Parish*, 308 F.3d 1025, 1032 (9th Cir. 2002) ("[W]e address the question whether it is permissible for the district court to consider the nature of the offense in combination with other factors increasing the susceptibility to abuse. We conclude that it is. Such an approach allows the district court to take into account all the circumstances of the crime and the defendant and to make an appropriate individualized determination.").

Moreover, these circumstances warrant the Court's consideration under 18 U.S.C. § 3553(a)(2)(D), which directs the Court to account for the need to provide the defendant with needed correctional treatment in the most effective manner, and under the broader § 3553(a) mandate to impose a sentence "sufficient, but not greater than necessary." A sentence that is equal in length to what a non-officer defendant would receive is not, in practice, equal in burden. This Court has the authority to account for that disparity. A further downward variance is warranted.

/ / /

---

placing him at a higher security level facility than his offense and history would otherwise warrant. See P5100.08, Ch. 5, p.2 https://www.bop.gov/policy/progstat/5100_008_cn-2.pdf (last visited April 22, 2026). The collateral consequences of these restrictions — reduced programming access, diminished eligibility for community placement, and the anxiety of heightened monitoring throughout his sentence — are real, concrete, and fall on Mr. Matic solely because of the career he chose in public service. That career has nothing to do with the offense for which he was convicted.

**VII.    Mr. Matic's Personal History and Characteristics Demonstrate That His Criminal Conduct Was an Aberration that Will Not Be Repeated**

Mr. Matic comes before this Court with no criminal history, a history of hard work and a devoted family life.[7] This offense, though very serious, is an aberration and not part of a pattern. The letters submitted on Mr. Matic's behalf uniformly attest to his honesty, loyalty, compassion, and sense of responsibility.

Courts have long recognized that the aberrant nature of a defendant's criminal conduct can justify a downward variance. See *United States v. Working*, 224 F.3d 1093, 1099 (9th Cir. 2000); *United States v. Fairless*, 975 F.2d 664, 669 (9th Cir. 1992) ("A single act of aberrant behavior is a mitigating circumstance not taken into consideration by the Guidelines which warrants departure.") When it promulgated the Guidelines, the Sentencing Commission recognized that it was unable to fashion guidelines that could apply to every offense. In particular, the Commission acknowledged that in fashioning the Guidelines, it did not deal with "single acts of aberrant behavior that still may justify probation at high offense levels through departures." U.S.S.G., Ch. 1, pt. A, § 4(d). As a result, "the Guidelines recognize that the first offense may constitute a single act of truly aberrant behavior justifying a downward departure." *United States v. Dickey*, 924 F.2d 836, 838 (9th Cir. 1991); see also *United States v. Takai*, 941 F.2d 738, 741 (9th Cir. 1991) (affirming trial court's downward departure to permit probation for two first offenders who plead guilty to charges of bribery and conspiracy to bribe a federal agent because, among other things, the defendants' conduct were "single acts of aberrant behavior").

---

[7] Section 3553(a)(1) directs courts to consider "the history and characteristics of the defendant" when imposing a sentence. This inquiry is "broad." *Gall*, 552 U.S. at 50 n.6. As the Supreme Court reaffirmed in *Pepper v. United States*, sentencing should reflect "the widest possible breadth of information about a defendant," to "ensure[] that the punishment will suit not merely the offense but the individual defendant." 562 U.S. 476, 488 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

PAGE 34 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

"Aberrant conduct is conduct that represents a 'short-lived departure from an otherwise law-abiding life.'" *Working*, 224 F.3d at 1099 (quoting *United States v. Colace*, 126 F.3d 1229, 1231 (1997)). "Aberrant behavior is best assessed 'in the context of the defendant's day-to-day life' rather than solely 'with reference to the particular crime committed.'" *Working*, 224 F.3d at 1101 (citations omitted). When considering whether a defendant's behavior falls within the "spectrum of aberrant behavior," the Court may consider "a convergence of factors," *Fairless*, 975 F.2d at 667, including:

> (1) the singular nature of the criminal act, (2) spontaneity and lack of planning, (3) the defendant's criminal record, (4) psychological disorders the defendant was suffering from, (5) extreme pressure under which the defendant was operating, including the pressure of losing his job, (6) letters from friends and family expressing shock at the defendant's behavior, and (7) the defendant's motivations for committing the crime.

*Colace*, 126 F.3d at 1231 n.2. None of these factors standing alone is dispositive; the court must review the totality of the circumstances when making findings of aberrancy. *Working*, 224 F.3d at 1100–01 (citing cases).

The totality of the circumstances makes clear that Mr. Matic's offense conduct constituted a singular departure from an otherwise law-abiding, indeed, law enforcing, life. The conduct represents a marked deviation by the Mr. Matic from an otherwise law-abiding life. Given the above, a substantial downward variance is warranted.

## CONCLUSION

Before the Court stands a good, but flawed, man who made serious and consequential mistakes that hurt innocent people. Mr. Matic has stepped forward, accepted responsibility without reservation, and made intentional conscious decisions towards making the victims of his crimes whole. Those choices are not strategic. They were costly, irreversible, and deeply

PAGE 35 – **DEFT. MATIC'S SENTENCING MEMORANDUM**

personal. But as outlined in the letters of support, they comport with Mr. Matic's demonstrated, life-long integrity.

Since this case began, Mr. Matic has demonstrated through sustained action, not words, that he understands the harm he caused and is committed to making amends. He has confronted his conduct honestly, tried to rebuild trust, and worked with intention to restore what he could to those he harmed.

The Court must impose a sentence that reflects not only the seriousness of the offense, but also the extraordinary steps Mr. Matic has taken toward redemption. Considering Mr. Matic's history and characteristics, the nature and circumstances of the offense, a sentence of significantly less than 24 months is sufficient, but not greater than necessary, to serve the purposes of sentencing. It is a sentence that holds Mr. Matic accountable while recognizing that punishment, when decoupled from mercy and proportionality, ceases to serve justice.

DATED: April 24, 2026.

ANGELI & CALFO LLC

*s/Michelle Holman Kerin*
Michelle Holman Kerin, OSB No. 965278
michelle@angelicalfo.com
121 SW Morrison Street, Suite 400
Portland, OR 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Attorneys for Defendant Anthony Matic*

PAGE 36 – **DEFT. MATIC'S SENTENCING MEMORANDUM**